**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN**

| | |
|---|---|
| STEPHANIE ANTHONY, | |
| Plaintiff, | Case No. |
| | Hon. |
| v. | United States District Judge |
| THE BOARD OF TRUSTEES OF MICHIGAN STATE UNIVERSITY, | Hon. United States Magistrate Judge |
| Defendant. | |

**COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES, AND JURY DEMAND**

Plaintiff Stephanie Anthony, through her attorney, Complains against Defendant Board of Trustees of Michigan State University as follows:

**PARTIES, JURISDICTION, AND VENUE**

1. Plaintiff Stephanie Anthony ("Dr. Anthony" or "Plaintiff") is a Black woman of Flint, Michigan, which is in Genesee County.

2. Defendant Board of Trustees of Michigan State University ("MSU" or "Defendant") is the governing body of Michigan State University, a public educational institution located in East Lansing, Ingham County, Michigan, and a subdivision of the State of Michigan.

3. At all relevant times, Plaintiff was employed by MSU.

4. MSU receives funding and financial grants and assistance from the United States federal government.

5. Plaintiff alleges violations of federal law, including the Family and Medical Leave Act, 29 U.S.C. Section 2601 et seq., Title VII of the Civil Rights Act of 1964, 42 U.S.C.

1

Section 2000e et seq., and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. Section 794; therefore, this Court has jurisdiction over this matter pursuant to 28 U.S.C. Section 1331.

6. The facts and allegations giving rise to the claims in this action occurred in East Lansing, Ingham County, Michigan, which is within the Western District of Michigan, and Defendant is located within this District; therefore, venue is proper in this District pursuant to 28 U.S.C. Section 1391(b).

7. Plaintiff timely filed charges of discrimination against Defendant with the United States Equal Employment Opportunity Commission ("EEOC"), including Charge No. 471-2025-00259 alleging discrimination on the basis of race and sex, and a charge dual-filed with the Michigan Department of Civil Rights (MDCR No. 662385; EEOC No. 23A-2026-00479) alleging discrimination on the basis of race, sex, and disability, and retaliation.

8. Plaintiff received a Notice of Right to Sue from the EEOC on or about March 7, 2025, and thereafter filed additional charges of discrimination, including EEOC Charge No. 471-2026-05687.

9. The parties entered into a tolling agreement, subsequently extended by written addenda, that preserved and tolled the statutes of limitations applicable to Plaintiff's claims, with the most recent extension continuing through July 31, 2026; therefore, Plaintiff's claims are timely and her administrative remedies are exhausted.

**FACT ALLEGATIONS**

10. Dr. Anthony began working for MSU in or around July 2015.

11.   In the fall of 2017, Dr. Anthony became the Director of MSU's Institutional Community-Based College Readiness Program.

12.   In this role, she stabilized and rebuilt a TRIO-based (U.S. government programs for low-income students) program after MSU had lost its federal funding for the program.

13.   In June of 2022, Dr. Anthony's leadership led to the restoration of the federal funding stream for this program, which allowed for the long-term sustainability of these college-readiness initiatives.

14.   In May of 2020, Dr. Anthony became the founding director of MSU's Office of College Access Initiatives.

15.   In this role, Dr. Anthony served as MSU's leader and state-wide spokesperson and senior representative for community partners, school districts, families, and other stakeholders for a multi-program, federally funded portfolio of programs targeted at pre-college and undergraduate populations.

16.   In April of 2023, Dr. Anthony was appointed an Advisor to the President of MSU in addition to continuing her work as director of the Office of College Access Initiatives.

17.   In her role as Presidential Advisor, Dr. Anthony was charged with advising the MSU President and senior leaders on crisis communications, reputational risk, and other highly sensitive issues, including issues around relationship violence and sexual misconduct.

18.   Between 2016 and 2020, Dr. Anthony served as a faculty member in MSU's College of Human Medicine, teaching courses in public health policy, healthcare systems, and applied leadership.

19.    In this role, she also served for two terms as Vice Chair of the MSU Faculty Senate.

20.    Throughout her employment, Dr. Anthony met, and many times exceeded, her employer's legitimate job performance expectations.

21.    Supervisors called Dr. Anthony "highly competent and independent," "very reliable and responsible," and "extremely diligent."

22.    Another performance review stated that "[t]here could not be a better public face for this study than Dr. Anthony."

23.    Dr. Anthony's appointment title with MSU was Specialist-Outreach.

24.    Dr. Anthony's work for MSU included directing federally funded college access programs, including Upward Bound.

**Brookins Creates a Hostile Work Environment for Dr. Anthony**

25.    Dr. Anthony first met Kwesi (Craig) Brookins on July 26, 2022, when he was a candidate for a Vice Provost position and she served on the search committee.

26.    Within minutes of meeting Dr. Anthony, Brookins told her that if he were not a Black man, he would have been a university president long ago.

27.    This statement was uncomfortable for Dr. Anthony to hear as a Black woman because she felt it was presumptuous about her views because of her race.

28.    Brookins began at MSU as Vice Provost for University Outreach and Engagement in January 2023.

29.    In that role, Brookins was Dr. Anthony's direct supervisor.

30.  In April of 2023, at a conference, Dr. Brookins sat with his legs spread and his hand on his groin in Dr. Anthony's presence, and this made Dr. Anthony extremely uncomfortable.

31.  Brookins demanded that Dr. Anthony perform menial tasks and personal errands for him, which was intended to demean her and her senior position at MSU.

32.  Indeed, Brookins ordered Dr. Anthony to run personal errands for him in front of his secretary, a white woman, whose job responsibilities actually included such tasks.

33.  Brookins repeatedly minimized Dr. Anthony's contributions and told her and others that her Presidential Advisor role had nothing to do with University Outreach and Engagement.

34.  Brookins repeatedly sabotaged Dr. Anthony's work, including by intentionally double-booking her for meetings and excluding her from department meetings.

35.  Brookins even once directed Dr. Anthony to a website and told her that the individual identified on that website—in fact his niece from Chicago—could replace her, thereby threatening Dr. Anthony that he had had the power to fire her and replace her.

36.  As a result of Brookins' conduct, by January of 2024 Dr. Anthony developed anxiety and insomnia and was prescribed anti-anxiety medication for the first time in her life.

37.  Brookins withheld and funneled away funding that the University had allocated to support Dr. Anthony in her dual roles, and insisted the money was "his money" to use as he chose, rather that funds to support Dr. Anthony's initiatives. These funds included $25,000 for administrative and student support related to her Presidential Advisor role and $25,000 for Dr. Anthony's professional development, conference

travel and other expenses related to her role as the Director of College Access Initiatives.

### Dr. Anthony Reports the Discrimination and Harassment

38. In February of 2024, Dr. Anthony met with then-President Teresa Woodruff and Dr. Carrie Moylan to report her concerns of sex and race discrimination, harassment, and retaliation.

39. President Woodruff referred Dr. Anthony to MSU Chief of Staff Michael Zieg.

40. During this discussion, Zieg confirmed that Brookins was withholding funds that had been allocated for Dr. Anthony's dual roles.

41. Zieg did not take any steps to help Dr. Anthony, such as instituting any corrective measures with Brookins.

42. However, Zieg did inform Brookins that Dr. Anthony had reported his conduct to the President and other senior officials.

### Retaliation Following Dr. Anthony's Complaints

43. As a result of Zieg learning that Dr. Anthony had reported him, Brookin's conduct against Dr. Anthony became more punitive and adverse in retaliation for her having reported her concerns of race and sex discrimination.

44. For instance, in first half of 2024, after Dr. Anthony had assumed the Presidential Advisor role, she worked without the promised compensation because Brookins intentionally delayed her contract signing for months. Interventions from Zieg and others were required over months before Dr. Anthony finally received her pay in August of 2024.

45. After the meeting with Zieg, Dr. Anthony confronted Brookins about the $50,000 in funds that he had withheld from her, and he laughed and told her that he would keep using those resources for himself, because it was "his money."

46. In April of 2024, Dr. Anthony gave Brookins a month's advance notice that she would be unavailable during part of May for a family event to celebrate the end of her husband's cancer treatments.

47. During that time away, Brookins insisted that Dr. Anthony work on matters for him and denied knowing that she was away.

48. In May 2024, Dr. Anthony filed a complaint with the Office of Faculty and Academic Staff Affairs regarding Brookins' interference with her scheduled time off.

49. After the FASA complaint, Brookins wrote up Dr. Anthony on false allegations of misconduct and dereliction of her duties in retaliation for her complaints of his violations of MSU policies.

50. During the month of June, Brookins solicited reports against Dr. Anthony from other MSU colleagues as retaliation for her having reported his misconduct.

51. In July of 2024, Brookins refused to accept grant money Dr. Anthony earned for her department.

52. In August of 2024, Brookins demanded that Dr. Anthony develop and submit new job descriptions for all of the 50+ staff in her unit.

53. No other Presidential Advisor or Director at MSU was required to perform such burdensome make-work.

54. On September 5, 2024, Dr. Anthony filed a formal complaint against Brookins with MSU's Office of Civil Rights Investigation, Support, and Resolution unit ("ISR"), assigned ISR Case No. 2024-02210.

55. Dr. Anthony's ISR complaint alleged harassment, discrimination on the basis of race and sex, a hostile work environment, and retaliation.

56. Starting in September of 2024, Brookins began to exclude Dr. Anthony from his staff and department meetings.

57. Specifically, he held his first Directors' meeting following the ISR complaint at his home, which made Dr. Anthony extremely uncomfortable, given that she had just filed a complaint of sex and race harassment against him, along with retaliation for having reported this harassment.

58. In October 2024, during the Spartan Bus Tour, an annual program across the state featured MSU faculty and administrators, Brookins inappropriately touched Dr. Anthony, by rubbing and bumping against her body, and repeatedly stared at her and remained in her line of sight as if to mock her or dare her to report him again.

59. Around the same time, Brookins filed a false and retaliatory ISR complaint against Dr. Anthony, which was closed promptly with a no-cause finding.

60. In December of 2024, Brookins undermined Dr. Anthony's programming for the start of 2026 by instructing his Chief of Staff to offer a different position to a key staffer in Dr. Anthony's area.

61. Brookins refused to allow Dr. Anthony to be compensated for a program she developed on her own time.

8

62. During a January 2024 meeting with an external consultant, Dr. Brookins interrupted Dr. Anthony and stated "No, she isn't" when she described her role on the President's Council.

63. During this period, Brookins refused to accept grant money associated with an award Dr. Anthony earned through her Relationship Violence and Sexual Misconduct role.

**MSU Refuses to Remove Brookins as Dr. Anthony's Supervisor**

64. After the incident on the Spartan Bus Tour, Dr. Anthony requested that she be assigned a different supervisor while her ISR complaint was pending.

65. It is the common, usual, and expected policy and practice at MSU to remove a complainant from the supervisory authority of the person she is accusing of harassment during the pendency of the investigation.

66. However, an ISR representative told Dr. Anthony that no other supervisor was available and that she would have to continue working under Brookins.

67. This statement was untrue because any number of senior members of the Provost's or the President's office could have served as Dr. Anthony's supervisor during the ISR investigation.

68. Dr. Anthony renewed her request for a different supervisor in November and December 2024, and each time was told that no one else was available.

69. Contrary to MSU's policy and practice designed to protect complainants from retaliation, MSU did not remove or replace Brookins as Dr. Anthony's supervisor while it investigated her ISR complaint against him.

70. In December 2024, Dr. Anthony asked Zieg to transition her supervision to the President's Office for the remainder of her assignment, but Zieg denied this request.

71. In January 2025, Dr. Anthony learned that a white colleague in a similar situation with an abusive supervisor had been granted the exact request Dr. Anthony had been denied: this white colleague was able to have her supervision changed to the President's office during the pendency of the investigation.

**Dr. Anthony's Disability and Medical Leave, and MSU's Interference**

72. Dr. Anthony is a person with disabilities, including Type 2 diabetes, sickle cell disease, major depressive disorder, generalized anxiety disorder, and other chronic conditions.

73. As the pressure and hostile treatment by Brookins increased, Dr. Anthony's health deteriorated.

74. The regular, typically controlled symptoms of her disabilities started to flare up under the stress, including renal papillary necrosis, which caused severe blood in the urine and impaired her kidney function.

75. On February 28, 2025, while on a college tour with 25 students and staff, Dr. Anthony broke her foot in two places.

76. Two weeks later, Dr. Anthony had to have emergency stomach surgery.

77. As a result, Dr. Anthony availed herself of FMLA benefits, taking intermittent medical leave in August 2024 give herself doctor-mandated rest and recovery as needed from the stressors of her work situation.

78.  In March of 2025, Dr. Anthony's health conditions required her to take a full-time FMLA leave because her symptoms that had been exacerbated by the harassment and stress were not resolving.

79.  Brookins interrupted Dr. Anthony's medical leave on multiple occasions to have her perform work related to staff reviews, budgets, and other responsibilities.

80.  Dr. Anthony made multiple reports to Human Resources about the repeated interruptions of her medical leave by Brookins and his staff, but MSU failed to respond or direct Brookins to cease such interference.

81.  It would turn out that Brookins abandoned Dr. Anthony's department and responsibilities while she was on medical leave and later used the incomplete work from that period of her medical leave as justification to have her performance unfairly questioned through a Performance Improvement Plan.

**Dr. Anthony Returns to Work from Medical Leave and Faces a New Supervisor Who is Charged to Set Her Up for Discharge**

82.  Dr. Anthony returned to work in July 2025.

83.  Following Dr. Anthony's return to work after her medical leave, MSU finally assigned a different supervisor.

84.  However, this interim supervisor, Defendant Elyse Aurbach-Pruitt, reports directly to Brookins.

85.  Dr. Anthony asked Aurbach-Pruitt to whom she reported, but Aurbach-Pruitt would not disclose it.

86.  The only reasonable explanation for Aurbach-Pruitt's refusal to disclose who supervised her was to prevent Dr. Anthony from learning that it was Brookins.

11

87.     Under information and belief, Brookins directed Aurbach-Pruitt to set Dr. Anthony up for an eventual discharge while keeping Brookins a step removed from the actual steps entailed to terminate a senior and well-respected administrator.

88.     Defendant MSU was at all times aware that Aurbach-Pruitt's direct reporting relationship to Brookins violated the spirit and letter of the protection that Dr. Anthony had requested, as it still put Brookins in a direct line of control and influence over her while her complaint against him was pending.

89.     In August of 2025, Dr. Anthony learned from others that Aurbach-Pruitt reported directly to Brookins.

90.     Dr. Anthony informed ISR that she was uncomfortable with Aurbach-Pruitt's supervision and requested a supervisor outside of Brookins' chain of supervision, but MSU once again denied Dr. Anthony's request to be protected from retaliation during the ISR investigation.

91.     For the duration of Dr. Anthony's employment at MSU, she remained under Aurbach-Pruitt's supervision, and Aurbach-Pruitt remained directly supervised by Brookins.

92.     Dr. Anthony had discovered when she returned from her medical leave that in her area, federally required summer programming had not been planned and departmental hiring was incomplete.

93.     This was work that Brookins had abandoned during Dr. Anthony's leave and later gave him and Aurbach-Pruitt fodder to question her performance.

94.     Beginning August 1, 2025, and continuing through at least December 15, 2025, Defendant also required Dr. Anthony to report her leave time and refused to allow her

to alter her work location, terms and conditions it did not impose on similarly situated employees who had not exercised FMLA rights or requested disability accommodations.

95.    On October 14, 2025, despite only having a few months' experience with Dr. Anthony, Aurbach-Pruitt implausibly placed Dr. Anthony on a Performance Improvement Plan ("PIP").

96.    Until this time, Dr. Anthony had always received strong performance reviews and even Brookins had called her his "superstar."

97.    The Performance Improvement Plan required Dr. Anthony to notify all of her staff members when she took FMLA leave.

98.    The Performance Improvement Plan required Dr. Anthony to mark her FMLA leave on the divisional calendar.

99.    The Performance Improvement Plan included allegations about matters that arose while Dr. Anthony was out on FMLA leave.

100.    Because of Dr. Anthony's wide-ranging role across the University and the broader community, these Performance Improvement Plan requirements forced her to disclose the medical and disability-related nature of her absences to a large group of staff and other individuals who had no legitimate need to know that information.

101.    When Dr. Anthony had complied with all terms of the PIP, Aurbach-Pruitt modified and expanded the PIP expectations without cause.

102.    For instance, in January of 2026, Aurbach-Pruitt extended the PIP to March 20, 2026, and added the vague issue of "fulfilling leadership expectations," which had no meaningful action items or ways to demonstrate compliance.

103.    Aurbach-Pruitt also improperly disclosed personal information about Dr. Anthony's salary to unauthorized persons within the unit, including a peer Director.

104.    Beginning August 1, 2025, and continuing through at least December 15, 2025, MSU subjected Dr. Anthony to terms and conditions of employment, including, requiring her to report her leave time, refusing to allow her to alter her work location, and requiring her to meet with her supervisor twice per month, that were not imposed on similarly situated non-disabled employees.

105.    During the latter half of 2025, the MSU president reconsidered the need for presidential advisors.

106.    In mid-October of 2025, MSU executed a Memorandum of Understanding regarding Dr. Anthony's appointment as Special Advisor on Relationship Violence and Sexual Misconduct for the MSU Office of the President. The MOU was signed by Aurbach-Pruitt and Zieg, among others.

107.    However, in early 2026, there was still a need for Dr. Anthony and her white colleagues who also held that title to continue performing their roles, and Zieg authorized their continued work and stipend for performing those duties.

108.    While the white colleague in that position received her stipend to continue serving as a presidential advisor along with her other duties in 2026, Aurbach-Pruitt refused to authorize Dr. Anthony's continued service in this distinguished position.

14

109.    Thus, Dr. Anthony's salary was reduced by $30,000 in 2026.

110.    Nonetheless, there were still assignments from the MSU President's office she performed without compensation during that time.

### Dr. Anthony is Approved for FMLA Leave

111.    On February 1, 2026, Dr. Anthony requested continuous FMLA leave due to a serious health condition.

112.    On February 2, 2026, MSU issued Dr. Anthony an eligibility, rights, and responsibilities notice for FMLA and short-term disability leave.

113.    While Dr. Anthony was on this leave, Dr. Aurbach appointed an acting director over Dr. Anthony's unit and initiated a compliance review of the Upward Bound program covering a period during which Dr. Anthony had been out on medical leave and another staff member had served as acting director.

114.    Dr. Anthony's leave was extended through July 20, 2026, with an anticipated return-to-work date of July 21, 2026.

### MSU Terminates Dr. Anthony's Employment

115.    While Dr. Anthony was on this FMLA and disability leave, Aurbach-Pruitt appointed an acting director over Dr. Anthony's unit and requested a compliance review of the Upward Bound program.

116.    On May 5, 2026, Aurbach-Pruitt issued Dr. Anthony a Notice of Intent to Dismiss her from her employment.

117.    Aurbach-Pruitt stated that the results of the compliance review, along with the PIP, were the basis for this decision.

118.    Aurbach-Pruitt had instituted this review in February of 2026 of the Upward Bound program but reviewed a period when Dr. Anthony was on medical leave and when there was another staff person as acting director.

119.    Aurbach-Pruitt cited alleged youth program policy violations relating to the Upward Bound program within Dr. Anthony's portfolio, including failure to perform background checks, provided release forms, and ensure program handbooks had current information.

120.    Aurbach-Pruitt also cited issues from the PIP and Dr. Anthony's performance history as well.

121.    Aurbach-Pruitt issued the Notice of Intent to Dismiss while Dr. Anthony was on medical leave and unable to return to work.

122.    On May 22, 2026, Dr. Anthony submitted a written response rebutting the Notice of Intent to Dismiss.

123.    In this rebuttal, Dr. Anthony noted that she had never been apprised of the concerns raised about the Upward Bound program and noted that the issues cited in the program audit occurred when she was on medical leave.

124.    Dr. Anthony also pointed out that many of the accusations raised were demonstrably false.

125.    Dr. Anthony further noted that none of the issues were serious enough to warrant anything more than staff training and certainly were not the kinds of concerns that would lead to termination but for the retaliatory intent of Aurbach-Pruitt and Brookins.

16

126. In other words, the accusation against Dr. Anthony used by Aurbach-Pruitt and Brookings to justify terminating Dr. Anthony's employment were pretextual, as Defendants' actual intent was to terminate Dr. Anthony in retaliation for having filed a complaint of workplace harassment.

127. Aurbach-Pruitt nevertheless issued a Final Notice of Dismissal, and Dr. Anthony's dismissal from her employment at MSU took effect on June 3, 2026.

128. Aurbach-Pruitt stated that Dr. Anthony's performance history---exemplary until she complained of harassment, interference with disability-related leaves, and retaliation—and the PIPs Aurbach-Pruitt imposed on her were the basis for the dismissal.

129. As a direct and proximate result of Defendants' unlawful conduct, Dr. Anthony has suffered economic damages, loss of wages and benefits, physical pain and suffering, humiliation, severe emotional distress, and damage to her professional reputation.

## COUNT I: INTERFERENCE WITH RIGHTS UNDER THE FAMILY AND MEDICAL LEAVE ACT, 29 U.S.C. SECTION 2601 ET SEQ.

130. Plaintiff incorporates all prior allegations by reference here.

131. The FMLA makes it unlawful for an employer to interfere with, restrain, or deny the exercise of or the attempt to exercise any right provided under the Act. 29 U.S.C. Section 2615(a)(1).

132. At all relevant times, MSU was an employer covered by the FMLA.

133. At all relevant times, Dr. Anthony was an eligible employee under the FMLA.

17

134.    Dr. Anthony had serious health conditions within the meaning of the FMLA, including severe physical and mental symptoms arising from Type 2 diabetes, sickle cell disease, generalized anxiety disorder, and major depressive disorder.

135.    Dr. Anthony was entitled to FMLA leave and gave Defendant notice at various times described above of her intention to take FMLA leave.

136.    Defendant granted Dr. Anthony her FMLA leave requests.

137.    Defendant interfered with Dr. Anthony's FMLA rights by repeatedly contacting her and requiring her to perform work assignments while she was on approved FMLA leave.

138.    Defendant interfered with Dr. Anthony's FMLA rights by requiring her, as a condition of her PIP, to notify her staff members of her FMLA leave and to mark her FMLA leave on the divisional calendar, thereby disclosing her medical needs to a large group of individuals who had no reason to know this information.

139.    Defendant interfered with Dr. Anthony's FMLA rights by requiring her to report her leave time and refusing to allow her to alter her work location, conditions not imposed on similarly situated employees who had not exercised FMLA rights.

140.    Defendant imposed discipline on Plaintiff and ultimately terminated her employment based on matters that arose while she was on protected medical leave.

141.    Defendant interfered with Dr. Anthony's FMLA rights and retaliated against her for exercising those rights by issuing a Notice of Intent to Dismiss and terminating her employment while she was on approved medical leave.

142. As a direct and proximate result of Defendant's unlawful interference with her FMLA rights, Dr. Anthony has suffered lost wages and benefits, economic loss, and other damages.

## COUNT II: SEX AND RACE DISCRIMINATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. SECTION 2000E ET SEQ.

143. Plaintiff incorporates all prior allegations by reference here.

144. Title VII prohibits an employer from discriminating against an employee with respect to the terms, conditions, or privileges of employment because of the employee's sex. 42 U.S.C. Section 2000e-2(a).

145. Title VII prohibits an employer from discriminating against an employee with respect to the terms, conditions, or privileges of employment because of the employee's race. 42 U.S.C. Section 2000e-2(a).

146. At all relevant times, Defendant was an employer within the meaning of Title VII.

147. Dr. Anthony is a woman.

148. Dr. Anthony is Black.

149. Dr. Anthony was qualified for the positions she held at MSU and received positive evaluations for years prior to Brookins becoming her supervisor.

150. As alleged above, Defendant knew of Dr. Anthony's concerns of a hostile work environment because of her race and her sex, yet it did nothing to remediate her concerns.

151. Thus, as alleged above, Defendant allowed Brookins to create and maintain a hostile work environment targeted at Dr. Anthony for a significant period of time.

19

152.    As a direct and proximate result of Defendant's unlawful discrimination, Dr. Anthony has suffered lost wages and benefits, economic loss, humiliation, and severe emotional distress.

**COUNT III: RETALIATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. SECTION 2000E ET SEQ.**

153.    Plaintiff incorporates all prior allegations by reference here.

154.    Title VII prohibits an employer from retaliating against an employee because she has opposed a practice made unlawful by Title VII or because she has made a charge, testified, assisted, or participated in an investigation, proceeding, or hearing under Title VII. 42 U.S.C. Section 2000e-3(a).

155.    Dr. Anthony engaged in activity protected by Title VII when she reported her concerns of sex and race discrimination and harassment to MSU leadership.

156.    Dr. Anthony engaged in activity protected by Title VII when she filed a formal complaint against Dr. Brookins on September 5, 2024.

157.    Dr. Anthony engaged in activity protected by Title VII when she filed charges of discrimination with the EEOC and the Michigan Department of Civil Rights.

158.    Defendant was aware that Dr. Anthony had engaged in protected activity.

159.    After Dr. Anthony engaged in protected activity, Defendant took adverse employment actions against her.

160.    Defendant's adverse actions included worsening mistreatment, withholding her pay, refusing to sign her contract renewal, placing her on a Performance Improvement Plan, and terminating her employment.

20

161. There is a causal connection between Dr. Anthony's protected activity and the adverse employment actions Defendant took against her.

162. As a direct and proximate result of Defendant's unlawful retaliation, Dr. Anthony has suffered lost wages and benefits, economic loss, humiliation, and severe emotional distress.

### COUNT IV: DISPARATE TREATMENT IN VIOLATION OF SECTION 504 OF THE REHABILITATION ACT OF 1973, 29 U.S.C. SECTION 794

163. Plaintiff incorporates all prior allegations by reference here.

164. Section 504 of the Rehabilitation Act provides that no otherwise qualified individual with a disability shall, solely by reason of her disability, be subjected to discrimination under any program or activity receiving federal financial assistance. 29 U.S.C. Section 794(a).

165. At all relevant times, MSU was a program or activity receiving federal financial assistance within the meaning of Section 504.

166. Dr. Anthony is an individual with a disability because she has physical and mental impairments, including uncontrolled Type 2 diabetes, sickle cell disease, generalized anxiety disorder, and major depressive disorder, that substantially limit one or more of her major life activities.

167. In the alternative, Defendant regarded Dr. Anthony as having such impairments.

168. Dr. Anthony was otherwise qualified to perform the essential functions of her position, with or without reasonable accommodation.

169. Defendant knew of Dr. Anthony's status as a person with disabilities.

21

170.    Defendant subjected Dr. Anthony to adverse employment actions, including placing her on a Performance Improvement Plan and terminating her employment.

171.    As alleged above, Defendant treated Dr. Anthony less favorably than similarly situated non-disabled employees.

172.    Defendant disclosed and used Dr. Anthony's disability and medical leave against her, including by imposing directives through the PIP that required her to reveal the medical and disability-related nature of her leave to staff members who had no reason to know that information.

173.    The reasons Defendant gave for disciplining and terminating Dr. Anthony were pretextual, as shown by Defendant's continued expansion of the PIP requirements despite her compliance and by its reliance on matters that arose during her protected medical leave.

174.    As a direct and proximate result of Defendant's unlawful discrimination, Dr. Anthony has suffered lost wages and benefits, economic loss, humiliation, and severe emotional distress.

## COUNT V: RETALIATION IN VIOLATION OF SECTION 504 OF THE REHABILITATION ACT OF 1973, 29 U.S.C. SECTION 794

175.    Plaintiff incorporates all prior allegations by reference here.

176.    Section 504 of the Rehabilitation Act prohibits retaliation against an individual because she has opposed a practice made unlawful by the Act or because she has exercised or attempted to exercise her rights under the Act.

177.    Dr. Anthony engaged in activity protected by Section 504 when she asserted her rights as an individual with a disability, including by requesting leave and

22

accommodation for her serious health conditions and by opposing Defendant's disability-based treatment of her.

178.    Dr. Anthony repeatedly brought to Defendant's attention that she was being unfairly treated because of her disabilities.

179.    After Dr. Anthony engaged in this protected activity, Defendant took further adverse employment actions against her, as alleged more completely above.

180.    There is a causal connection between Dr. Anthony's protected activity and the adverse employment actions Defendant took against her.

181.    As a direct and proximate result of Defendant's unlawful retaliation, Dr. Anthony has suffered lost wages and benefits, economic loss, humiliation, and severe emotional distress.

## REQUEST FOR RELIEF

On the basis of the above allegations and claims, Plaintiff respectfully requests the following relief:

A.  An award of economic damages reflecting lost wages, lost benefits, and other economic harm caused by Defendant's unlawful conduct;

B.  An award of compensatory damages for humiliation, mental anguish, and severe emotional distress caused by Defendant's unlawful conduct;

C.  An award for wages, salary, employment benefits, and other compensation denied or lost by reason of Defendant's violations;

D.  An award for any actual monetary losses sustained as a direct result of Defendant's violations, including any recoverable care-related or other direct monetary losses;

E.  Prejudgment interest on Plaintiff's recoverable monetary losses;

F.  Liquidated damages under the FMLA in an amount equal to Plaintiff's recoverable

FMLA damages and prejudgment interest;

G.  A declaration that Defendant's acts and omissions violated the Family and Medical

Leave Act, Title VII of the Civil Rights Act of 1964, and Section 504 of the

Rehabilitation Act of 1973;

H.  Appropriate equitable relief, including reinstatement to Plaintiff's employment, or in

the alternative, an award of front pay;

I.  Reasonable attorney's fees, expert witness fees, and costs; and

J.  Any and all other relief that this Court deems appropriate.


Respectfully submitted by,

By:  s/Robin B. Wagner
       Robin B. Wagner (P79408)
       Attorney for Plaintiff
       [FIRM NAME]
       [STREET ADDRESS]
       [CITY, STATE ZIP]
       [TELEPHONE]
       [EMAIL]

Dated: July 29, 2026

24

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MICHIGAN**

| | |
|---|---|
| STEPHANIE ANTHONY, | |
| | Case No. |
| Plaintiff, | |
| | Hon. |
| v. | United States District Judge |
| | |
| THE BOARD OF TRUSTEES OF MICHIGAN STATE UNIVERSITY, | Hon. |
| | United States Magistrate Judge |
| | |
| Defendant. | |

**JURY DEMAND**

Plaintiff hereby requests that this matter be tried before a jury.

Respectfully submitted by,

By: s/ Robin B. Wagner
Robin B. Wagner (P79408)
Robin Wagner Law, PLLC
Attorney for Plaintiff
402 W. Liberty Street, rear
Ann Arbor, MI 48103
robin@robinwagnerlaw.net
734-294-3035

July 29, 2026

25